IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MAURICIO OROZCO-RIOS, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | No. 3:14-cv-00568 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Judge Trauger |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Movant Mauricio Orozco-Rios ("Orozco" or "the movant") brings this action with the assistance of counsel pursuant to 28 U.S.C. § 2255 to set aside, vacate and correct an allegedly illegal sentence imposed by this court on March 9, 2011. The court previously entered orders denying relief on the basis of the movant's claim that his guilty plea was involuntary and setting an evidentiary hearing on his claims of ineffective assistance of counsel at sentencing. In light of the evidence presented during the evidentiary hearing as well as the court's own recollection of the sentencing hearing, the court will grant relief and order resentencing.

## I.      Procedural and Factual Background

Orozco and thirteen co-defendants[1] were indicted in August 2009 on a charge of conspiracy to possess with intent to distribute 5 kilograms or more of a mixture and substance containing cocaine, a Schedule II controlled substance. (Case No. 3:09-cr-00186, ECF No. 48 (all subsequent references to the record will be to the criminal case, unless otherwise indicated).) A Third Superseding Indictment added a charge of knowing possession of one or more firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c), against Orozco and two of his co-defendants.[2] (ECF No. 342.)

Orozco pleaded guilty to Count One of the Third Superseding Indictment on October 22, 2010. (ECF Nos. 478, 479.) Although there was no plea agreement and no agreement regarding sentencing,

---

[1] One of the defendants, Armondo Jaimes-Salazar, was indicted but deported before being arrested.

[2] Count One of the Third Superseding Indictment (the conspiracy count) charged only the six defendants, including Orozco, who had not already pleaded guilty by the time it was returned on March 31, 2010.

the United States agreed to dismiss Count Two, the weapons charge, upon Orozco's being sentenced on Count One. (*Id.* at 6.) At the plea hearing, the Assistant United States Attorney ("AUSA") read a statement of facts setting forth the basis for the guilty plea, specifically noting that it was the United States' position that the total amount of cocaine for which the defendant was responsible was between 50 and 150 kilograms. (Plea Hearing Tr., ECF No. 702, at 19.) The movant conceded that he was guilty of the crime charged and that the United States would be able to prove that he had conspired with others to possess with intent to distribute at least 5 kilograms of cocaine, but he expressly reserved the right to contest the quantity of cocaine that should be considered for sentencing purposes. (*Id.* at 20–21.)

After Orozco entered his guilty plea, the probation office prepared a presentence investigation report ("PSR") (ECF No. 683), attributing responsibility to Orozco for conspiring to distribute 127.5 kilograms of cocaine and 17.48 kilograms of marijuana. This quantity included 42.5 kilograms of cocaine that were referenced during intercepted telephone calls between November 2008 and July 2009, plus an additional 9 kilograms of cocaine and 17.48 kilograms of marijuana seized from the co-conspirators' homes or vehicles in Nashville on August 14, 2009, the day of Orozco's arrest. The 127.5 total also included an additional 76 kilograms of cocaine seized from a residence in Atlanta that had previously been identified during the investigation as a "stash house" used by the co-conspirators. Based on this quantity of drugs, the PSR recommended a base offense level of 36, *see* U.S.S.G. § 2D1.1(2) (2009 ed.), and a final offense level of 41, which incorporated a 2-level increase for possession of a firearm; a 4-level increase for being a leader or organizer of the conspiracy; a 2-level increase for obstruction of justice; and a 3-level reduction for acceptance of responsibility.

Both parties filed sentencing positions. Orozco's defense counsel argued that attributing responsibility to Orozco for the 76 kilograms recovered in Atlanta was unwarranted, but he did not expressly object to his client's being held responsible for the other 51.5 kilograms of cocaine. Counsel objected to the offense-level increases for possession of a firearm and obstruction of justice but did not object to the increase for the defendant's being a leader or organizer of the conspiracy. (ECF No. 620.)

In its sentencing memorandum, the United States agreed with the probation office that the movant should be found responsible for the entire 127.5 kilograms of cocaine but noted that, "[r]egardless of whether this Court finds him responsible for those 76 additional kilograms [seized from the Atlanta

stash house], if the defendant does not contest the facts in the PSR describing the possession and distribution of the other 51.5 kilograms, then the defendant's base offense level" would not be affected.[3] (ECF No. 631, at 3.) The United States agreed that the applicable guideline range was 360 months to life imprisonment and recommended that the court sentence Orozco at the bottom of the range, to 360 months of imprisonment. (ECF No. 632, at 1.)

At the sentencing hearing, conducted in two parts, on March 3 and 9, 2011, there was some confusion on the court's part regarding whether Orozco had already admitted at the plea hearing to involvement in the possession or distribution of at least 50 kilograms of cocaine, as opposed to at least 5 kilograms, as charged. Neither defense counsel nor the AUSA corrected that misunderstanding. However, counsel for Orozco effectively conceded that his client was responsible for at least 50 kilograms of cocaine and objected only to the inclusion of the 76 kilograms of cocaine recovered in Atlanta and the 17.48 kilograms of marijuana included in the calculation of the total quantity of drugs for sentencing purposes. Defense counsel further voiced his belief at that time that the inclusion of the cocaine found in Atlanta and the marijuana found in Orozco's garage would affect the court's calculation of the base offense level. The AUSA argued again that if the defendant "was not objecting to the 51.5 kilograms of cocaine described in the presentence report," his offense level would start at 36, "whether or not the Court includes the marijuana, whether or not the Court includes the 76 kilos found down in Atlanta." (ECF No. 704, at 6 (Sentencing Hr'g Tr. at 35).) Counsel for Orozco eventually conceded that inclusion of the drug quantities to which he objected would have no effect on the base offense level. The court therefore declined to make any factual determination as to whether Orozco should be considered responsible for the 76 kilograms recovered in Atlanta or the marijuana recovered in Nashville, "because it doesn't make any difference in the guideline range." (ECF No. 704, at 8–9.)

The AUSA put on witnesses to support the PSR enhancements for possession of a firearm in furtherance of the conspiracy and for obstruction of justice. At the close of the hearing, defense counsel

---

[3] The Drug Quantity Table in the Sentencing Guidelines Manual starts with a base offense level of 34 if the quantity of cocaine involved is at least 15 but less than 50 kilograms of cocaine, and a base offense level of 36 if 50 to 150 kilograms of cocaine are involved. See U.S.S.G. § 2D1.1(c)(2) & (3) (2009). For that reason, the United States accepted that, for sentencing purposes, the 76 kilograms seized in Atlanta were immaterial, since defense counsel conceded that the United States could establish the facts concerning Orozco's involvement in the possession and distribution of the other 51.5 kilograms.

argued that these enhancements should not apply. Nonetheless, despite taking this position, he asked the court "to consider imposing the minimum sentence within the

range" of 360 months to life, as set out in the PSR. (*Id.* at 73.) Both the court and the prosecutor were demonstrably surprised that defense counsel asked for a guideline-range sentence:

> Mr. Hannafan [the AUSA]: I'm – to be clear, did Mr. Gant say he was recommending the bottom of the guideline range?

> The Court: He said the minimum sentence within the guideline range. Is that what you said?

(*Id.*) The court accepted the petition to plead guilty and, in accordance with both parties' recommendations, sentenced the movant to the minimum advisory guideline range of 360 months' incarceration and 5 years of supervised release.[4]

By the time Orozco entered his guilty plea, eleven of his co-conspirators had already pleaded guilty. By the time he was sentenced in March 2011, six of those who pleaded guilty had already been sentenced to prison terms ranging from 33 to 135 months.[5] Defendant Sixto Arellano-Garcia, who had been found guilty at trial on both counts charged in the Third Superseding Indictment, was sentenced a month before Orozco to 240 months on Count One and 60 months on Count Two, to run consecutively. The five co-defendants sentenced after Orozco received sentences ranging from 18 to 63 months.

## II.    The Motion and Amended Motion

The court previously disposed of the petitioner's other claims, but one of the petitioner's claims of ineffective assistance of counsel remains pending. Specifically, the petitioner asserted in his original petition that defense counsel was ineffective for requesting that the court impose a guideline sentence of 360 months instead of a "statutory sentence of 20 years." (Section 2255 motion, Case No. 3:14-cv-00568,

---

[4] In addition to the base offense level of 36, based on drug quantity, the court accepted the PSR's other findings, including the 2-level increase for possession of a firearm; 4-level increase for being a leader or organizer of the conspiracy; and 2-level increase for obstruction of justice, for an offense level of 44. The United States moved for a 2-level downward adjustment for acceptance of responsibility, rather than 3 levels, because the defendant pleaded guilty on the eve of trial, yielding a total offense level of 42 rather than the 41 set out in the PSR. The movant's criminal history category was I, and the resulting advisory guideline range was 360 months to life.

[5] The two sentences in excess of 120 months were subsequently reduced to 120 months by order entered August 17, 2015, and one motion to reduce sentence remains pending.

ECF No. 1, at 4.) The court liberally construed this claim as asserting that trial counsel was ineffective for failing to argue for a variance from the sentencing guideline range.

The court appointed counsel and scheduled an evidentiary hearing to further consider this claim. The petitioner, through counsel, filed an Amended Petition, specifically asking the court to "revisit and reconsider all of the points raised" in Orozco's original petition. (Case No. 3:14-cv-00568, ECF No. 53, at 1.) In addition, the Amended Petition asserts that trial counsel was ineffective for failing to seek a below-guideline sentence based on sentencing disparity under 18 U.S.C. § 355e(a)(6). The movant also raised a second ineffective-assistance claim, as follows:

> Sentencing counsel was ineffective in that he did not raise the issue of whether the statements by the court to the defendant regarding the amounts of controlled substance involved for sentencing purposes were correct interpretations of what the court stated. Mr. Orozco-Rios believes he heard the interpreter say that he was pleading to the 5 kg. or more, and that he was not admitting the "or more" part of the claim. Taking into consideration all of the statements made by the court to the defendant at the sentencing hearing, namely its statements about the fact that he was pleading to 5 kg or more but that he was not admitting to the "or more" it is not difficult to understand that Mr. Orozco-Rios believed that he was pleading to 5 kg. period. If a recording of the interpretation made to the defendant at the plea hearing is available, a transcript of the recording coupled with a review of it by a third party interpreter might assist the court in determining whether the court should credit Mr. Orozco-Rios's claim that what he understood was that he was pleading to 5 kg. of cocaine. If the statements of the interpreter to the defendant in Spanish are not available, then there is no way for the court to determine what was actually in Mr. Orozco-Rios's mind at the time that he entered his plea of guilty. Accordingly, Mr. Orozco-Rios respectfully asks the court to order the production of a transcript of the statements made by the interpreter to him in Spanish at the plea hearing, and to take them into consideration in its administration of this petition. Further, he requests that his counsel be provided with a copy of that transcript.

(*Id.* at 1–2.)

The United States filed a response in opposition to the Amended Petition, arguing with respect to the first claim that (1) the Amended Petition does not explain what good faith basis existed for making a sentencing-disparity argument or describe how the imposition of a sentence at the bottom of the guideline range created an unwarranted sentencing disparity; (2) the co-defendants' sentences were substantially lower than Orozco's for good reason; and (3) the court was aware of and could have invoked § 3553(a)(6) *sua sponte* at sentencing, despite defense counsel's failure to make a disparity argument, so the movant was not prejudiced by counsel's error. (Amended Response, Case No. 3:14-cv-00568, ECF No. 58.)

The United States construes the poorly articulated second claim as arguing that trial counsel "did not correct this Court when there was confusion by the Court regarding whether defendant had already

admitted at his plea hearing that he was responsible for 50 kilos of cocaine (he had not)." (*Id.* at 3.) The United States argues that the failure to correct the court's confusion was not prejudicial to Orozco, because the government could and would have put on evidence to prove that amount and was also prepared to put on evidence to establish Orozco's responsibility for the 75 kilograms seized in Atlanta from the co-conspirators who were supplying Orozco with cocaine. The United States also notes that the court "has already ruled that the defendant knowingly pleaded guilty to a conspiracy involving not only 5 kilograms of cocaine, but to 5 kilograms or more of cocaine." (*Id.* at 3 n.1.)

III.     **The Hearing**[6]

Orozco and his criminal defense attorney, Assistant Federal Public Defender Isaiah Gant, testified at the hearing conducted on December 15, 2015.

Orozco testified through an interpreter that he met with Gant a "very few times" between his arrest and his guilty plea. He asserted that, in pleading guilty, it was his understanding that he was pleading guilty to a conspiracy to distribute only 5 kilograms of cocaine and that the United States would have to prove "kilo for kilo" any amount in excess of 5 kilograms. From going over the PSR with his attorney prior to the sentencing hearing, he believed that his attorney would object to the drugs recovered from Atlanta and the marijuana, but he understood from his attorney that the other amounts attributed to him on the basis of the wiretaps added up to 49 kilograms and that, because it was less than 50 kilograms, there was no need to object to it. He understood that, since the gun charge was being dismissed, his sentence would not be enhanced based on gun possession. His attorney believed that, because the quantity was less than 50 kilograms and this was a first conviction, his sentence would not be more than 20 years.

On cross-examination, Orozco indicated that he was surprised at the sentencing hearing when it became clear that his attorney was conceding to his involvement in 51.5 kilograms. He also insisted that he never saw the PSR until he had already been sentenced and was in prison preparing his appeal.

For his part, Mr. Gant testified that he had probably had five sit-down meetings with his client and a translator and numerous other brief meetings, where he would stop by to check in and say hello

---

[6] For purposes of this ruling, the court has relied upon a "rough copy" of the hearing transcript provided by the court reporter.

whenever he was at the facility where Orozco was housed at the time. At the substantive meetings, he discussed with his client the wiretaps and went over the line sheets that summarized the wiretapped telephone calls line by line; they discussed the impact of this evidence on the case.

According to Gant, his client told him immediately that he wanted to plead guilty, but Gant told him to wait until it was clear that a deal would be preferable to going to trial. Gant testified that he expressly discussed the minimum and maximum possible sentences with his client and did not tell him that the two-level sentencing enhancement for possession of a weapon would go away since the gun charge was dropped.

He denied telling Orozco that the line sheets only established 49 kilograms. Rather, he told him that, if he could keep the quantity attributed to Orozco to less than 49 kilograms, that would affect the sentencing range: "And there was a discussion that if I could get this to 49, below 49, then your guideline range is going to be less, but it was a discussion. It was not a promise." However, he conceded that he told his client that, based on his experience with the court, he did not think the judge would give him more than twenty years. Gant hastened to add that he never told his client "there was no way" he was going to be sentenced to more than 20 years. Rather, he told his client that, based on his experience, he did not think the judge would give him more than 20 years.

Gant also testified that he was present when Lupe Botts, the investigator/interpreter employed by the Federal Defender's Office, read the PSR to Orozco in Spanish, page by page, and explained it to him, including the applicable guideline range. After that, Gant discussed with Orozco that the guideline range established by the PSR was substantially more than 20 years, and they also went over the arguments Orozco wanted him to make. Gant told him that he could not argue "with a straight face" that Orozco did not have a leadership role in the conspiracy, but some of the other objections Orozco wanted to raise were possibilities. He also told the movant that he believed the government could prove Orozco's involvement in distributing at least 50 kilograms and that he did not believe he could successfully challenge the government's contention that it could prove at least 50 kilograms.

Asked why he did not correct the court's misstatement that the defendant had agreed at his plea hearing that he was responsible for at least 50 kilograms, Gant responded that he honestly did not know

why he did not correct the court's statement but that there was "a lot going on," there was "tension in the courtroom," and the court's statement "just got by" him.

Asked why he did not raise an argument about disparity in sentencing, Gant testified that "the reason disparity didn't . . . come into mind" was because, based on prior experience, he believed the court would tell him: "when you talk about disparity, it's disparity on a national basis. It has nothing to do with, you know, defendants among defendants." The court took serious issue with that statement: "I very carefully look at disparity within a case, especially a big drug conspiracy case." Gant nonetheless reaffirmed that that was his feeling, stating, "That's not an argument that I would normally make because of that."

He also claimed that, at the time of the sentencing hearing, he believed the court was aware of the disparity factor and, having handed them down, was aware of the sentences that had been imposed on the co-defendants. In other words, Gant suggested at the hearing that the court could and should have taken within-case disparity into account at sentencing, even though he himself did not make a disparity argument and, along with the AUSA, requested a guideline-range sentence.

While still under direct examination, Gant testified that none of the other defendants held a position of leadership in the conspiracy; only one or two were held responsible for possession of a firearm, and none was held responsible for obstruction of justice.

In response to a question about why he did not make a specific argument concerning his client's remorse, Gant responded as follows:

> One of the things you do and I've done over the years as a trial lawyer, you get a sense of what's going on in the courtroom. There's a – you can't describe it, but you sit there and you're watching the reaction of the Court, the reaction of the witnesses, your own reaction, and sometimes, sometimes it is much, much more persuasive to not only be quiet in terms of being verbal, but to be still.

> And in the situation that I saw and felt in the courtroom at the time in terms of arguing or being quiet suggested to me based upon my experience, it might just be better off to be quiet and be still, because in the record the Court had already indicated that, one, Mr. Orozco-Rios had testified, had shown remorse. She believed it was sincere, so it was there. So it wasn't necessary for me to argue it. But that's – that's how I felt.

Asked about the thought process behind asking for a sentence at the bottom of the guideline range, 360 months, rather than a below-guideline sentence, Gant attempted to explain that the evidence presented so far by the government had been pretty powerful, that the court had commented that the

evidence of Orozco's gun possession was "overwhelming," and that the court did not appear to be favorably considering the arguments against an enhancement based on intimidating a witness. By the time the court asked him what sentence he believed would be appropriate, he had a strong sense that the hearing was not going well for his client. So, he said,

> I'm thinking, I just want to make 360 the ceiling. I want to make it the ceiling. And when I thought about that, Judge -- and it wasn't like strategic or anything like that. You're standing there, you're on your feet, you're trying to do what you think is appropriate at the time, when I said the 360, I knew that I would not get any argument from the government.

> And one of the things that pushed me in that regard was that counsel for the government, by the time counsel got through arguing about the scourge . . . of drugs on the community, I was confident if I said low end of the guideline range, the government would not argue, wouldn't contest it. And given the state of record, if the Court wanted to impose a sentence less than that, I would certainly hope so, but that was my thinking. I was trying to make 360 the floor -- pardon me, the ceiling.

On cross-examination, Gant conceded that he had made some mistakes in the case and that, "given the nature of this case and all that was involved, just about any mistake could be harmful" to his client. He confirmed that he discussed sentencing and drug quantities with his client numerous times over the course of several months leading up to the sentencing hearing. They discussed the reasons for trying to keep the amount attributed to Orozco to less than 50 kilograms, but by the time of sentencing, Gant did not feel he had a legitimate basis for contesting the government's position that Orozco was responsible for distributing 50 or more kilograms of cocaine.

Gant did not believe he discussed sentencing disparity with his client. He nonetheless agreed that it would have "behooved" him to discuss with his client the § 3553 factors in favor of mitigating his sentence.

The court then asked Gant directly: "If you really didn't think that I would give your client any more than 20 years, given that he's basically a first offender in our system, why did you ask for 30 years?" Gant essentially reiterated what he had said during direct examination:

> Judge, that was because after I sat through that sentencing hearing and I listened to the testimony, I kept thinking, wow, there's a possibility that he could get – he could get 360 or more.

> Because when that testimony came in and I'm sitting there and I'm listening to it and though Your Honor said, well, I'm not going to worry about the testimony about murders and all that kind – Judge, I sat there and I kept saying to myself, 240 would look good.

> And then more testimony, I kept saying, wow, there was just – the dynamics that was

going on, Judge, just made me believe that the thing I needed to do was to be sure that he couldn't get more than 360. And I figured if I asked for a sentence that the government would not object to, then with that, given what I knew about the Court, the Court could look at this and say, either it's an appropriate sentence or the Court could give a sentence less.

But I just didn't want him to get any more than that 360. And when I sat there and listened to that testimony at the sentencing hearing, I thought there was a possibility that he could get more.

The court did not credit this testimony. The court asked, incredulously: "Mr. Gant, you say that you know the Court. And you think that I would be affected if the government objected to the fact that you requested a sentence below the guidelines? . . . . You think that's going to mean anything to me?"[7]

The court then questioned Gant about other evidence in the record that he could and should have brought to the court's attention and that could have provided a basis for arguing that a below-guideline sentence was warranted.

THE COURT: . . . . The defendants who had been sentenced before this defendant, Martinez, Juve, received a sentence of 135 months. And Enrique Jimenez, Quique, had received a sentence of 120 months. Sergio Orozco-Rios had received a sentence of 128 months. Mauricio Beltran Jaimes, Neto, had received a sentence of 50 months. Juvercio Rodriguez-Peña, Rene, had received a sentence of 33 months. Marcos [Arriaza]-Rios had received a sentence of 60 months.

Sixto Arellano-Garcia, Tito, who went to trial, had received a sentence on Count One of 240 months, and then he got the consecutive five years. So he, who went to trial, got a sentence of 300 months. his was all information available to you before sentencing. Did you look at it?

THE WITNESS: No, Judge, I did not.

THE COURT: And do you think you were at fault, perhaps, for not looking at that and bringing to my attention that you were – that this man was being asked to serve 30 years, more than anybody else, only two of those people had 5Ks,[8] that's all available to you as well. To me it's outrageous that you asked for the bottom of the guidelines for this man.

THE WITNESS: Very well, Your Honor.

THE COURT: Do you think you were at fault for not looking at what the other sentences had been?

THE WITNESS: I certainly should have, Your Honor.

THE COURT: And you sat through the sentencing hearing that you said was just very

---

[7] The court's incredulity was based on the fact that Gant, as a busy public defender, had had numerous cases and revocation proceedings before the court, going back several years.

[8] The term "5K," short for U.S.S.G. § 5K1.1, refers to a motion by the government for a downward departure from the otherwise applicable guideline range based the defendant's having offered substantial assistance to the investigation or prosecution of another person.

stressful or emotional or whatever. I'm wondering if you heard this testimony. Mr. Sepulveda testified as a government witness at the sentencing, the prosecutor put him on to talk about the quantities, I believe, primarily.

Mr. Sepulveda testified, despite the government's version that this defendant was No. 1 leader, Mr. Sepulveda testified at the sentencing hearing where you sat in this courtroom and heard it, that this defendant worked for Juve [Martin Martinez].

Do you remember hearing that testimony, that the government witness testified that your client worked for Juve and Mr. Juve, Martin Martinez, got 135 months without a 5K? Does that sound fair to you?

THE WITNESS: No, Your Honor, it doesn't.

THE COURT: You don't have to agree with the prosecutor that your client is the No. 1 leader. You have an obligation, don't you think, to investigate on your own and figure out who the leader is and make an argument to the Court if you don't think he's the leader. You didn't make that argument, did you?

THE WITNESS: I did not, Your Honor.

THE COURT: Did you also hear the testimony of Investigator Green, who testified that Rene [Juvercio Rodriguez-Peña], who also had already been sentenced, who got a 5K, Mr. Rodriguez-Peña, Investigator Green testified at the sentencing hearing that Rene killed someone. And on cross of Investigator Green, he said that the defendant, as far as he knew, was not involved in any of those killings.

So we have Rene who had already been sentenced and got 33 months and the investigator put on the stand by the government says he killed someone, and the investigator says, your client didn't kill anybody as far as he knows, you didn't bring any of that to the Court's attention, did you?

THE WITNESS: Judge, I do remember the testimony of Green. I don't remember the testimony of the previous witness you mentioned, but you're right, Your Honor.

THE COURT: . . . I mean, do you not think that's an argument you could have made to me?

THE WITNESS: Yes, Judge. Yes.

THE COURT: . . . You gave me no mitigating circumstances whatsoever. You basically placed it in my lap and said, well, your Honor, you've got the presentence report and you've heard the testimony. Period, paragraph.

And I've heard your testimony that this was a strategy. It wasn't a strategy, it was laziness or inattention or maybe you had some terrible thing going on in your private life at the moment, I don't know. But for you to make no arguments whatsoever, ask for an astronomical amount of time, more than anybody else had received, give me nothing to go on, that I'm supposed to sit here – both sides are asking for the bottom of the guidelines. Even if I thought it was unfair, how am I supposed to ferret out all these factors that might be mitigating for this defendant? That's your job, isn't it?

THE WITNESS: Yes, Your Honor.

IV. **Discussion**

    *A.*    *Standard of Review*

    The movant in this action seeks to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. To do so, he must demonstrate that (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is "otherwise open to collateral attack." 28 U.S.C. § 2255(b). Generally, sentencing challenges not made on direct appeal are waived and cannot be made for the first time in a post-conviction § 2255 motion. *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001). However, "challenges that cannot otherwise be reviewed for the first time on a § 2255 motion can be reviewed as part of a . . . claim that counsel provided ineffective assistance under the standard set forth in *Strickland v. Washington*." *Id.* Criminal defendants are guaranteed the effective assistance of counsel by the Sixth Amendment. To prevail on a § 2255 motion under the standard established by the Supreme Court, a movant must establish (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because he is seeking relief under § 2255, the movant bears the burden of proving by a preponderance of the evidence that his counsel was deficient. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

    *B.*    *Amended Petition, Ground Two*

    The basis for relief set forth in ground two of the Amended Petition is not clearly articulated. As set forth above, the movant, through counsel, contends that "[s]entencing counsel was ineffective in that he did not raise the issue of whether the statements by the court to the defendant regarding the amounts of controlled substance involved for sentencing purposes were correct interpretations of what the court stated [sic]." (Amended Petition at 1.) Orozco appears to be asserting that he intended to plead guilty— and believed he was pleading guilty—to conspiring to possess or distribute 5 kilograms of cocaine, not 5 kilograms *or more*. He asks for a recording of the actual statements he made to the interpreter during the plea hearing and for such recording to be transcribed by a third-party interpreter for the purpose of "assist[ing] the court in determining whether the court should credit Mr. Orozco-Rios's claim that what he understood was that he was pleading to 5 kg. of cocaine" rather than to 5 kilograms *or more* of cocaine.

(*Id.* at 2.)

Insofar as Orozco is attempting to argue that his plea was involuntary and that his trial attorney was ineffective for failing to seek to set aside the plea on the basis that it was involuntary, or that his trial attorney was ineffective for failing to make it clear to the court that his client was pleading guilty to a conspiracy involving no more than 5 kilograms of cocaine, the court rejects this claim for the reasons set forth in the original memorandum opinion addressing the movant's involuntary-plea claim. Orozco clearly pleaded guilty to conspiring to distribute 5 kilograms *or more* of cocaine. The movant is not entitled to relief on the basis of this claim.

Unlike the United States, the court does not construe the claim as asserting that counsel was ineffective for failing to correct the court's mistaken recollection, during sentencing, that the movant had pleaded guilty to conspiring to possess or distribute at least 50 kilograms of cocaine. Even if this in fact is the claim the movant intended to articulate, the record establishes that the movant was not prejudiced by the error on his attorney's (and the court's) part, because his attorney had reasonably concluded that he no legitimate basis for contesting Orozco's responsibility for at least 51.5 kilograms of cocaine. Orozco does not contest that conclusion in his Amended Petition; nor did he or his counsel dispute it at the recent evidentiary hearing. The claim, however construed, does not warrant relief.

### C.     Trial Counsel's Request for a Guideline Sentence

Orozco also contends that his counsel was ineffective at sentencing for requesting a guideline sentence of 360 months and failing to make a sentencing-disparity argument based on 18 U.S.C. § 3553(a)(6) or otherwise. Defense counsel also failed to argue that other mitigating factors, including the defendant's apparent remorse and lack of a criminal record, should be considered as a basis for a downward variance from the advisory guideline range.

The United States argues that relief is not warranted because: (1) the Amended Petition does not explain what good faith basis existed for making a sentencing-disparity argument or describe how the imposition of a sentence at the bottom of the guideline range created an unwarranted sentencing disparity; (2) the co-defendants' sentences were substantially lower than Orozco's for good reason; and (3) the court was aware of and could have invoked § 3553(a)(6) *sua sponte* at sentencing, despite his counsel's failure to make a disparity argument, so the movant was not prejudiced by his attorney's failure.

The government further asserts that the lengthy sentence was appropriate in light of the nature of the crime and the aggravating circumstances.

Although the parties fail to recognize the distinction, there are at least two separate claims at issue here: (1) whether counsel was ineffective for failing to argue for a downward variance based on § 3553(a)(6); and (2) whether counsel was ineffective for failing to argue for a downward variance based on disparity among the sentences imposed on the co-defendants in this case and other factors relevant to this particular case, including the movant's expression of remorse and his lack of a criminal record.

With regard to the first issue, the alleged failure to make a § 3553(a)(6) argument, the law is clear that § 3553(a)(6) itself is not concerned with disparities between co-conspirators' sentences. *United States v. Wallace*, 597 F.3d 794, 803 (6th Cir. 2010). Instead, § 3553(a)(6) is meant to ensure nationally uniform sentences among like offenders, "so as to leave room to depart downward for those defendants who are truly deserving of leniency." *United States v. Simmons*, 501 F.3d 620, 623–24 (6th Cir. 2007); *see also United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008) ("[T]his factor concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct—not disparities between co-defendants." (citation omitted)). The court has an independent obligation to consider this factor, but the Sixth Circuit has recognized that "the Guidelines themselves represent the best indication of national sentencing practices" and, therefore, that "by initially and correctly determining what [the defendant's] advisory Guidelines range would be, the sentencing court necessarily . . . took account of the national uniformity concern embodied in § 3553(a)(6)." *United States v. Houston*, 529 F.3d 743, 752 (6th Cir. 2008).

There is no proof in the record that Gant was ineffective for failing to raise national uniformity in sentencing as a basis for seeking a reduction in Orozco's sentence; nor is there proof of prejudice resulting from any such failure. Specifically, Orozco has not presented any statistical or other evidence suggesting that his lengthy sentence is inconsistent with those imposed nationally upon defendants with "similar criminal backgrounds convicted of similar criminal conduct." *Simmons*, 501 F.3d at 623. He is not entitled to relief on the basis of his sentencing attorney's failure to make a § 3553(a)(6) argument.

With regard to the second claim, while a district judge is not *required* to consider the disparity between the sentences of co-defendants, he or she "*may* exercise his or her discretion and determine a

defendant's sentence in light of a co-defendant's sentence." *Wallace*, 597 F.3d at 803 (citing *Simmons*, 501 F.3d at 625). And if counsel had raised such an argument at Orozco's sentencing, assuming he had a good faith basis for doing so, the court would have been required to consider it. *See United States v. Gapinski*, 561 F.3d 467, 474 (6th Cir. 2009) ("[W]hen a defendant raises a particular[, nonfrivolous] argument in seeking a lower sentence, the record must reflect both that the district judge considered the defendant's argument and that the judge explained the basis for rejecting it." (alteration in original) (quoting *United States v. Lalonde*, 509 F.3d 750, 770 (6th Cir. 2007)).

The United States argues that the Amended Petition does not explain what good faith basis existed for making a sentencing-disparity argument or describe how the imposition of a sentence at the bottom of the guideline range created an unwarranted sentencing disparity. While it is true that Orozco's motion and amended motion did not clearly articulate the available good faith bases for making a sentencing-disparity argument, the bases for such a motion were nonetheless explored during the hearing. Notably, Orozco's sentence was more than 10 times greater than that of some of his co-defendants. The sole co-defendant who went to trial rather than pleading guilty, defendant Sixto Arellano-Garcia, received a 240-month sentence on Count One of the Third-Superseding Indictment, ten years less than Orozco received on the same charge, even though Orozco pleaded guilty and expressed remorse. These facts alone warranted, *at a minimum*, trial counsel's bringing to the court's attention the disparity between the guideline range for Orozco and the sentences his compatriots had received.[9]

Second, although there were many reasons why most of the co-defendants' sentences were much lower than Orozco's, as the court pointed out at the recent hearing, counsel could have argued that co-defendant Martin Martinez (also known as Juve) received a much lower sentence (135 months, initially) and no upward adjustment for a leadership position in the conspiracy, despite the fact that Jorge Sepulveda testified for the government during Orozco's sentencing that Orozco actually worked for Martinez. (ECF No. 704, at 27–28.) Similarly, Franklin Police Officer and DEA Task Force Agent Andy Green testified during Orozco's sentencing hearing that another co-defendant, Juvercio Rodriguez-Pena

---

[9] It must be noted that Gant had told Orozco on more than one occasion that he did not think the judge would give him more than 20 years (240 months), and yet he never requested or argued for that sentence.

(also known as Rene), who was sentenced to 33 months, was also charged with involvement in a murder in connection with the conspiracy. Orozco was not alleged to been involved in any murders.[10] In sum, there may well have been good reasons to support the sentences of Orozco's co-defendants, but that does not obviate the existence of good faith and potentially meritorious arguments in favor of a downward variance from the guideline range in Orozco's case, based on the enormous discrepancy between his sentence and those of his co-defendants.

The United States also argues that Orozco was not prejudiced by counsel's failure to bring these issues to the court's attention, because the court, having sentenced the other defendants, was presumably aware of the length of those sentences. Defense counsel claimed at the hearing that he believed it was better to be "still" and "quiet" rather than to vigorously argue for a lesser sentence for his client, because he had the sense that if he asked for a sentence at the bottom of the guideline range, the government would not argue against his position. In other words, defense counsel and the government would place upon the court the responsibility to examine the record and glean from it a reason to impose a non-guideline sentence and support it with its own reasons, *in the face of a joint recommendation of the parties for a guideline sentence*.

The court rejects this proposition. *Defense counsel* has the obligation to present such arguments for his or her client, to point out to the court the reasons that would support a downward variance if such reasons exist, and to propose a sentence that, in counsel's view, is more reasonable in light of all the applicable factors, including but not limited to disparity of sentences among co-defendants. Counsel's failure to do so—and his purported conclusion that it was better to be "still" and "silent" and simply hope that the court would *sua sponte* impose a lesser sentence—did not amount to a strategy. Counsel effectively abnegated his responsibility to function as counsel. *Cf. Strickland*, 466 U.S. at 687 (deficient performance is established by "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment").

_____

[10] Although the court obviously heard the testimony of these two witnesses at the sentencing hearing and might be faulted for not extracting on her own from that testimony the arguments that should have been made by defense counsel, this is a bridge too far. It is defense counsel's obligation to see an argument that can be made and then to decide whether to make it. It appears here that Mr. Gant did not even see the arguments that he could have made in favor of his client, let alone reject them as not helpful or damaging.

The court is cognizant that, in judging an attorney's conduct, the court must consider all of the circumstances and facts of the particular case and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In this case Gant conceded that he himself did not look at or consider the sentences of Orozco's co-conspirators. Any reasonable attorney would have made himself familiar with the sentences already handed down to the co-conspirators in the case. And any reasonable attorney would have raised an argument at sentencing based on the wide discrepancy between Orozco's potential sentence and the actual sentences his co-conspirators had received, particularly the sentences of those whose conduct and degree of responsibility were not terribly different from Orozco's. Moreover, a reasonable attorney would have argued mitigating factors, such as remorse and the lack of a criminal record. Gant made no such arguments.

In sum, the court finds that Orozco's attorney's failure to ascertain the co-defendants' sentences and to make available arguments in support of a below-guideline sentence for his client, in conjunction with counsel's acquiescence in the government's proposed guideline sentence, amounted to deficient performance. The question, then, is whether Orozco was prejudiced by the failure.

Prejudice, under *Strickland v. Washington*, requires a showing that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In the context of sentencing, the question is whether there is a "reasonable probability that, absent the errors," the court would have imposed a different sentence. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003) (holding that the validity of an ineffective-assistance claim based on an attorney's failure to offer mitigating evidence at a capital sentencing depends on whether the attorney conducted an objectively reasonable investigation into the defendant's background, given prevailing professional norms and the context of the investigation from counsel's perspective at the time (citing *Strickland*)).

In other words, the court is not required to find, at this juncture, that it *would* have imposed a different sentence if defense counsel had made the appropriate arguments in support of a downward variance from the guideline range. Rather, the court must determine whether there is a reasonable probability that it would have imposed a lesser sentence. The court finds, based on its own prior practices

in similar cases and on this record, that there is a reasonable probability that, but for counsel's errors in failing to bring to the court's attention, and make appropriate arguments about, the much shorter sentences imposed upon co-defendants already sentenced, along with the other mitigating evidence discussed herein, the court would have imposed a below-guideline sentence.

**V.      Conclusion**

For the reasons set forth herein, the court finds that the movant is entitled to relief on the basis that his counsel was ineffective at sentencing. His motion to vacate his sentence will be granted, and an order setting a date for a new sentencing hearing will be entered separately.

An appropriate order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge